IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TIFFANY WORKMAN, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 05 C 0004 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| ROBERT DINKINS and JULIE DINKINS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Tiffany Workman ("Plaintiff"), individually and as Special Administrator of the Estate of Jacob Lamb, a minor, ("Jacob") brought suit for wrongful death and survival against Defendants Bob Dinkins II ("Mr. Dinkins") and Julie Dinkins ("Mrs. Dinkins" and together with Mr. Dinkins "Defendants"), alleging that Defendants are liable for the death of her five-year-old son Jacob, who drowned in Defendants' pool. Pursuant to 28 U.S.C. § 1332, federal jurisdiction is proper based on diversity of citizenship of the parties and the matter in controversy exceeding $75,000. Because Plaintiff has not shown as a matter of law that Defendants owed Jacob a duty, Defendants cannot be held liable for his death. Even assuming that Plaintiff were able to show that Defendants owed a duty, Defendants cannot be held liable because there is no genuine issue of material fact as to whether Defendants' failure to maintain the swimming pool area, provide adequate safeguards to prevent unauthorized access to the pool, and to provide adequate supervision to Jacob was the proximate cause of Jacob's death. Additionally, there is no genuine issue of material fact as to whether Defendants' violations of the Will County Zoning Ordinance and Will County Building Code ("the Regulations") were the proximate cause of Jacob's death. Accordingly, Defendants' Motion for Summary Judgment is granted.

## FACTS

This suit stems from the tragic death of Jacob Lamb, who drowned in a swimming pool located in the backyard of his grandparents' home. Plaintiff's Amended Complaint at ¶¶ 2, 9. Jacob was the son of Plaintiff and Kendal Lamb ("Lamb"). Defendants' Statement of Material Facts Pursuant to Rule 56.1(a)(3) at ¶ 3 (hereafter "Def. 56.1 at ¶ __"). Jacob was the grandson of Defendants, who are the mother and stepfather of Lamb. Def. 56.1 at ¶ 3, Defendants' 56.1(a)(1) Exhibit C at pg. 5, lines 18-23. At the time of the incident, Jacob was five years old, approximately three feet tall, and weighed between fifty and sixty pounds. Def. 56.1 at ¶¶ 22-23, Plaintiff's Statement of Material Facts Pursuant to Rule 56.1(a)(3) at ¶ 22 (hereafter "Pl. 56.1 at ¶ __"). Prior to the incident, Jacob had been in Defendants' pool only three to five times, and only when other people were present. Def. 56.1 at ¶ 30. Jacob did not know how to swim, and when he had gone in Defendants' pool, he used arm flotation devices. Def. 56.1 at ¶ 31. In fact, Jacob was scared of water; he did not even like to take baths and would not go near water by himself. Def. 56.1 at ¶¶ 27-29. Jacob was also a bright child who listened well and would follow instructions when he was told to do something. Def. 56.1 at ¶¶ 25-26.

**The Incident**

On July 2, 2004, Jacob began a two-week visitation with Lamb, his father. Def. 56.1 at ¶ 32. On July 4, 2004, Lamb and Jacob went to Defendants' residence in Wilmington, Illinois, between approximately 2:30 and 3:00 p.m. Def. 56.1 at ¶¶ 6, 33. Jacob had been to Defendants' house numerous times before July 4, 2004. Def. 56.1 at ¶ 34. Defendants owned a swimming pool which was built in 2001. Def. 56.1 at ¶ 7. When Lamb and Jacob arrived at Defendants' residence, Defendants were the only people there. Def. 56.1 at ¶ 36. After Lamb's and Jacob's arrival, Jacob began to play in the front yard, while Lamb joined Mr. Dinkins at the grill in front of the house near

the garage. Def. 56.1 at ¶ 37, 39. Approximately fifteen to twenty minutes after their arrival, Jacob asked Lamb about going swimming in Defendants' pool; Lamb and Mr. Dinkins told Jacob that they would all go swimming together after dinner, and Lamb told Jacob to go inside and put on his swim trunks. Def. 56.1 at ¶¶ 40-42. After Jacob had returned outside wearing his swim trunks and gym shoes, Lamb told Jacob to put on his sandals instead, and to go inside and show Mrs. Dinkins. Def. 56.1 at ¶¶ 43-44.

Mrs. Dinkins, who was in the kitchen at the time, saw Jacob for the first time when he came into the house wearing the swimsuit. Def. 56.1 at ¶ 47. Jacob then complained to Mrs. Dinkins about the holes in his swimsuit; Mrs. Dinkins saw that Jacob was referring to his swimsuit's netting and told him that the swimsuit looked good on him and that they were all going to go swimming after they ate. Def. 56.1 at ¶ 49. Mrs. Dinkins and Jacob spent about three or four minutes together, after which Jacob left and went toward the living room; Mrs. Dinkins thought that Jacob was going to the living room to watch television until they ate, although she did not actually tell him to watch television. Def. 56.1 at ¶¶ 48, 50-51.

At approximately the same time, Mr. Dinkins finished preparing dinner and Lamb went inside the house to tell Mrs. Dinkins and Jacob that dinner was ready. Def. 56.1 at ¶ 52. Not seeing Jacob inside, Lamb asked Mrs. Dinkins where Jacob was; Mrs. Dinkins then told him that Jacob had just left the utility room. Def. 56.1 at ¶¶ 53-54. Lamb began looking for Jacob throughout the house, while Mrs. Dinkins went out into the backyard through the utility room door. Def. 56.1 at ¶ 55. Approximately two or three minutes later, Mrs. Dinkins found Jacob in the pool and screamed that Jacob was in the pool. Def. 56.1 at ¶¶ 56-57, 65. Lamb heard the scream, ran to the pool, and arrived at the pool within two seconds. Def. 56.1 at ¶ 58. Lamb found Jacob in the pool on the side nearest the house, directly opposite the ladder; he then jumped over the side of the pool and carried

Jacob out of the pool. Def. 56.1 at ¶¶ 59-60. Jacob was not moving at the time. Def. 56.1 at ¶ 59.

Mr. Dinkins ran from the front of the house to the backyard and saw Lamb carrying Jacob and asking for help; Mr. Dinkins then began to administer CPR to Jacob on the pool deck. Def. 56.1 at ¶¶ 61-62. The paramedics later arrived and took Jacob to the hospital, where he was pronounced dead. Def. 56.1 at ¶ 63. Jacob was found in the pool roughly five minutes after he went into the house, and between twenty and forty minutes after he and Lamb arrived at the Defendants' house. Def. 56.1 at ¶¶ 64, 66. Lamb had remained on the Defendants' property the entire time until the incident occurred. Def. 56.1 at ¶ 35. The Kankakee County Coroner's Jury determined that Jacob's death was accidental. Def. 56.1 at ¶ 67.

**The Defendants' Pool**

The Defendants' swimming pool was located approximately seventy-five feet behind their residence; it was approximately four feet tall and was filled with clean water to about ten inches from the top of the pool. Def. 56.1 at ¶¶ 8-9. The pool was partially surrounded by a deck that was built in 2002; the deck went about one-third of the way around the pool, was four feet high, sixteen feet wide, twenty-four to thirty feet long, with two gated openings and four steps leading from the ground to the top of the deck. Def. 56.1 at ¶¶ 10-11, Pl. 56.1 at ¶ 15. One gate was at the top of the stairs leading to the deck ("deck gate"); the other gate was on the deck and led to the pool ("pool gate"). Def. 56.1 at ¶ 12. The deck gate was thirty to thirty-six inches wide, three-and-a-half feet tall, and approximately eight feet away from the pool; the pool gate was five to six feet wide, four feet tall, and six inches thick. Def. 56.1 at ¶¶ 13-14. On the date of the incident, there was a lock that had a latch that shut over and then twist locked on the pool gate. Pl. 56.1 at ¶ 21. Defendants did not know whether or not either gate was locked or latched at the time that Jacob accessed the pool. Pl. 56.1 at ¶ 24.

Defendants had rules pertaining to the use of their pool by children, specifically that children were not allowed to go in the pool without adult supervision; someone was always present with the children in the backyard. Def. 56.1 at ¶¶ 15-16. Defendants' children and grandchildren were told of these rules; Jacob knew he was not to go outside by the pool or deck unless someone was with him, and he had never been left unattended in the Defendants' pool, nor had he ever been in the pool by himself. Def. 56.1 at ¶¶ 18-20. Neither of the Defendants nor Lamb had ever even seen Jacob open the pool gate. Def. 56.1 at ¶ 21.

**Will County Zoning Ordinance, Building Code, and Swimming Pool Regulations**

The Will County Zoning Ordinance, which governed the construction of Defendants' pool, was established for the promotion of public health, safety, morals, and welfare. Pl. 56.1 at ¶ 3. Section 8.7-5-a of the Will County Zoning Ordinance required either that the entire lot where a pool was located be fenced with a fence of a minimum height of five feet, or that an enclosure of a minimum of twenty-four inches be attached to the ledge of the pool wall. Pl. 56.1 at ¶ 4. Section 8.7-5-b of the same ordinance required that pool gates be equipped with self-closing and self-latching devices designed to keep and capable of keeping such gate securely closed at all times when not in actual use. Pl. 56.1 at ¶ 5.

The Will County Building Code, which also governed the construction of Defendants' pool, was established to safeguard life or limb, health, and public welfare. Pl. 56.1 at ¶ 6. The Building Code required that a permit be obtained in advance of the erection or installation of a structure such as Defendants' pool. Pl. 56.1 at ¶ 7.

A Will County Swimming Pool Regulations Affidavit, which specifically set forth all of the fencing, gate, and permit requirements of the Zoning Ordinance and Building Code, was to be executed before the construction of any swimming pool. Pl. 56.1 at ¶ 9-10. The Swimming Pool

Regulations Affidavit also provided that these regulations were intended to help prevent drowning and electrical shocks. Pl. 56.1 at ¶ 11. Mr. Dinkins did not make any inquiries as to whether a permit was required for Defendants' pool, did not attempt to find out whether there were any regulations or ordinances that might apply to the erection of a pool, and did not inquire as to whether a fence would be required to have around a pool. Pl. 56.1 at ¶¶ 12-14.

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the non-moving party cannot rest on its pleadings, but use evidentiary tools – depositions, answers to interrogatories, and affidavits that are part of the record – to show specific facts creating a genuine issue for trial. *Id.* at 324. A material fact is a fact that is outcome determinative under the governing law. *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). In determining whether a genuine issue as to any material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the Court will accept that statement as true for purposes of summary judgment. *Terry v. Am.*

6

*Airlines, Inc.*, 2004 U.S. Dist. LEXIS 19712, at 35 (N.D. Ill. 2004). An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

## DISCUSSION

The Court applies Illinois state law to this matter because the case comes before the Court on diversity jurisdiction and all events leading to this suit occurred in Illinois. The purpose of the Illinois Wrongful Death Act is to compensate the surviving spouse and next of kin for the pecuniary losses sustained due to the decedent's death. *Beetle v. Wal-Mart Assocs., Inc.*, 761 N.E.2d 364, 369 (Ill. App. Ct. 2001). The Illinois Survival Act allows a decedent's survivors to recover damages for injuries suffered by the decedent prior to death. *Id.* at 368. In order to maintain a wrongful death claim, a plaintiff must demonstrate: (1) the defendant owed a duty to the decedent; (2) the defendant breached that duty; and (3) the breach of duty proximately caused the decedent's death. *Leavitt v. Farwell Tower Ltd. P'ship*, 625 N.E.2d 48, 52 (Ill. App. Ct. 1993). If the plaintiff fails to establish one of these elements, summary judgment for the defendant is proper. *Id.* The existence of a duty is a question of law; the issues of breach and proximate cause are factual matters for a jury to decide if there exists a genuine issue of material fact regarding those issues. *Buchaklian v. Lake County Family YMCA*, 732 N.E.2d 596, 599 (Ill. App. Ct. 2000).

In support of their Motion for Summary Judgment, Defendants argue that summary judgment must be granted in their favor because Plaintiff cannot establish the first prong of the test set forth in *Leavitt*, that Defendants owed a duty to Jacob, because Illinois law has established that the

negligence of a parent in failing to supervise a child is not a foreseeable event and that swimming pools are obvious dangers which will not impose duties on their owners. In the alternative, Defendants argue that even if Defendants owed a duty to Jacob, that there exists no genuine issue of material fact that Defendants' breach of that duty proximately caused Jacob's death because the negligence of Lamb in failing to supervise Jacob was the superseding cause of Jacob's death. Because this Court finds that Plaintiff has failed to prove that Defendants owed Jacob a duty as a matter of law, Defendants Bob and Julie Dinkins are entitled to judgment on both counts as a matter of law. Even assuming that Defendants' alleged violations of the Regulations created a duty and a breach, Plaintiff has failed to prove that those violations, or any other acts of the Defendants, were the proximate cause of Jacob's death; this finding further supports judgment for Defendants Bob and Julie Dinkins on both counts as a matter of law.

## I. Whether Defendants Owed Jacob a Duty

Whether a duty exists between two parties is a question of law properly decided by the court. *Ward v. K Mart Corp.*, 554 N.E.2d 223, 226 (Ill. 1990). The Illinois Supreme Court has identified factors relevant to a legal determination of the existence of a duty, including the "reasonable forseeability" of injury, the likelihood of injury, and the burden of guarding against the injury. *Ward*, 554 N.E.2d at 226-27.

Generally, the duty to keep a child safe lies with his or her parents rather than with the owners of property on which a child is injured. *Mt. Zion State Bank & Trust v. Consolidated Comm's, Inc.,* 660 N.E.2d 863, 868 (Ill. 1995). However, a defendant landowner may be liable for harm to children on his or her property if the plaintiff shows that: (1) the landowner knew or should have known that young children habitually frequent the property; (2) a dangerous condition was present on the property; (3) the dangerous condition was one that was likely to cause injury to

children because of their inability to appreciate the risk involved; and (4) the burden of remedying the condition was slight compared to the risk to the children. *Kahn v. James Burton Co.*, 126 N.E.2d 836, 842 (Ill. 1955). In such cases, there is a duty imposed upon the owner or other person in possession and control of the premises to exercise due care to remedy the condition or otherwise protect the children from injury resulting from it. *Id.*

While *Kahn* applies to dangers on property generally, Illinois courts do not impose a duty upon landowners for conditions which are obvious to children and which children generally would be expected to appreciate and avoid. *T.T. by B.T. v. Kim*, 662 N.E.2d 561, 564 (Ill. App. Ct. 1996) (citing *Corcoran v. Village of Libertyville*, 383 N.E.2d 177, 180 (Ill. 1978)). Therefore, the threshold determination in any application of the *Kahn* test is whether the plaintiff has established the existence of a dangerous condition or an obvious condition on the property. *Stevens v. Riley*, 580 N.E.2d 160, 164 (Ill. App. Ct. 1991). The issue of whether a condition is obvious is determined by the objective knowledge of a reasonable person, not the injured party's subjective knowledge. *Buchaklian*, 732 N.E.2d at 602.

Defendants assert that they cannot be held liable under the Wrongful Death Act as a matter of law because they did not owe a duty to Jacob. Defendants argue that their lack of duty under the circumstances of this case may be established in two ways: (1) the incident was not foreseeable as a matter of law because Lamb's failure to supervise Jacob was not foreseeable; and (2) the incident was not foreseeable because the swimming pool represented an obvious danger that does not impose a duty on Defendants. Plaintiffs assert that the injury was reasonably foreseeable because Defendants failed to follow the Will County ordinances and codes for pool construction in violation of the test set forth in *Kahn*. Because Jacob's father was present at the time of the accident, and because swimming pools are open and obvious dangers, Defendants did not owe a duty to Jacob

9

regardless of the Will County ordinances and codes.

## A. Parental Supervision

Defendants argue that they did not owe a duty to Jacob because Lamb, Jacob's father, was on the premises and supervising his child during the incident, making Jacob's accidental drowning an unforeseeable event to Defendants. In Illinois, courts have held that when a parent is supervising a child, "it [is] not foreseeable that [a parent] would fail to supervise [his or her child] adequately, and it is more desirable to place the substantial burden of supervising . . . upon plaintiff rather than the homeowners. *Englund v. Englund*, 615 N.E.2d 861, 867 (Ill. App. Ct. 1993), *accord O'Clair v. Dumelle*, 735 F. Supp. 1344 (N.D. Ill. 1990), *aff'd*, 919 F.2d 143 (7th Cir. 1990). The *O'Clair* court granted defendant landowners' motion for summary judgment in a wrongful death action, holding that no duty was owed from the defendants to the child because "it was not reasonably foreseeable that [the plaintiff], as [the child's] mother, would fail to perform her parental duty to supervise [the child] by taking any number of precautions . . . to safeguard her daughter from the risks posed to [the child] by the pool." *Id*. at 1350, 1353.

The *O'Clair* court supported its decision by citing and discussing five Illinois Appellate court decisions that illustrated how a parent's duty of supervision affects the forseeability of harm to the child. *Id*. at 1349; *see Mooney v. Etheridge,* 382 N.E.2d 826 (Ill. App. Ct. 1978) (park district owed no duty to child hit by car while crossing the street to get to a park district building, because the decision to drop the child off across the street from the building was the decision of the mother, who had the primary duty to protect the child); *Kay v. Ludwick*, 230 N.E.2d 494 (Ill. App. Ct. 1967) (homeowner riding a lawnmower owed no duty to four-year-old injured while attempting to climb the mower because the operation of the mower was either fully known to the parent or patently obvious to the parent, and it seemed clear that the mother observed no apparent harm in permitting

the child to play in the yard while the mower was in operation); *Trotter v. Chi. Hous. Auth.*, 516 N.E.2d 684 (Ill. App. Ct. 1987) (housing authority owed no duty to child burned when he fell from a bed onto a steam pipe because it was not reasonably foreseeable "that an [eleven]-month-old infant . . . would be left unattended on a bed without sides"); *Keller by Keller v. Mols*, 472 N.E.2d 161 (Ill. App. Ct. 1984) (homeowners owed no duty to supervise child injured playing floor hockey at their house where injured child's parents saw the children playing and neither prohibited them from doing so nor warned them to wear protective equipment); *Campbell v. N. Signal Co.*, 430 N.E.2d 670 (Ill. App. Ct. 1981) (presence of mother in the vicinity of child's accident on grandmother's farm acted to reduce level of conduct expected of the grandmother). The *O'Clair* court also found that the fact that the child was in the custody of and under the supervision of her mother at the time of the incident was crucial in negating the reasonable forseeability of the incident. 735 F. Supp. at 1351.

Illinois state courts have also recently addressed accidents involving children who have drowned while under the supervision of their parents. In *Stevens*, an Illinois appellate court affirmed a grant of summary judgment for the defendant pool owners in a negligence action concerning a one-and-a-half year old child. 580 N.E.2d at 162. The child was on the premises with her parents at the time of the accident. *Id.* The *Stevens* court did not impose a duty on the defendants because "[r]equiring defendants to anticipate the injury to [the child] would be requiring them to anticipate the negligence of her parents." *Id.* at 167. The court found that no duty existed "where it is shown that the child was injured as a result of an obvious danger while being supervised by his parents or when the parents knew of the existence of the dangerous condition that caused the child's injury." *Id.* at 166-67. Another Illinois appellate court affirmed summary judgment for the defendant landowners because no duty existed to prevent a child from reaching a swimming pool when the child was under the supervision of her parent, and that it was the parent's "responsibility to make

sure that [the child] did not gain access to the pool. . . ." *Englund*, 615 N.E.2d at 867.

**B. Open and Obvious Danger**

Defendants also argue that they did not owe a duty to Jacob because the swimming pool constitutes an open and obvious danger. Under Illinois law, obvious dangers include fire, drowning in water, or falling from a height. *Mt. Zion State Bank & Trust*, 660 N.E.2d at 869. Specifically, swimming pools have been held to be obvious dangers as matters of law. *Id*. at 870 (fenced pool was obvious danger to six-year-old child); *Englund*, 615 N.E.2d at 868 (swimming pool obvious danger as a matter of law). Additional cases address the obviousness of various other kinds of open waters. *See Stevens*, 580 N.E.2d at 165-66 (creek in backyard partially obscured by weeds, and known about by parents, was an obvious danger negating duty); *Cope v. Doe*, 464 N.E.2d 1023, 1028 (Ill. 1984) (retention pond only partially covered with ice was not a dangerous condition); *Corcoran*, 383 N.E.2d at 181 (water-filled ditch was risk which children generally would be expected to recognize and appreciate).

**1. Defective Condition**

Plaintiff first contends that there is a genuine issue of material fact as to whether or not the Defendants' pool was defective, or was a dangerous condition on the property. Plaintiff's Response to Defendants' Motion for Summary Judgment at 6-7 (hereafter Pl. Resp. at ___). Plaintiff supports this contention with Defendants' failure to fully enclose their pool with a fence and their failure to install self-closing or self-latching gates as required by the Regulations. Pl. Resp. at 6.

However, whether the pool was constructed according to the Will County Regulations does not bear on the obviousness of the danger of an open swimming pool. The rationale for the "no duty" rule for obvious dangers is that, "because children, like adults, are expected to avoid dangers which are obvious, there is no reasonable foreseeable risk of harm." *Mt. Zion State Bank & Trust*,

12

660 N.E.2d at 868-69; *Englund*, 615 N.E.2d at 865; *Stevens*, 580 N.E.2d at 165 (all citing *Cope v. Doe*, 464 N.E.2d at 1027). Both *Mt. Zion State Bank & Trust* and *Englund* support the conclusion that the presence of a structure, such as a pedestal or a "defective" deck, or the lack of a structure, such as a fence enclosing the pool, that allows children access to an obvious danger, such as a pool, does not make that danger any less obvious. In *Mt. Zion State Bank & Trust*, the Illinois Supreme Court found that although the injured child had used the defendant's pedestal to climb over the fence surrounding the pool, the placement of the pedestal next to the fence did not render the danger of the pool less obvious and plaintiff failed to show that the pedestal, the fence, and the pool combined to create a latent dangerous condition. 660 N.E.2d at 870. The *Englund* court found the swimming pool obvious as a matter of law despite alleged defects in the condition of the deck. 615 N.E.2d at 868. Defendants' deck was similar to the one at issue in *Englund*, in that both decks surrounded a portion of the pool and did not have self-closing gates. *Englund*, 615 N.E.2d at 863; Pl. 56.1 at ¶¶ 19-21.

With regard to the magnitude of guarding against the injury and the consequence of placing the burden on the Defendants, Plaintiff again points to Defendants' alleged violations of the regulations. Pl. Resp. at 10-11. However, as will be discussed in more detail *infra*, the purposes of the fencing and gating requirements in the Regulations were to prevent uncontrolled access to the pools by trespassing children. With regard to the burden of supervising Jacob, an invited guest in the presence of his father, it is more desirable to place the substantial burden of supervising a child upon its parents rather than the homeowners. *Stevens*, 615 N.E.2d at 867. While the burden to guard against the injury may or may not weigh in Plaintiff's favor, it does not outweigh the imposition of a duty on defendants with open and obvious dangers on their property. In fact, neither party has cited a case involving an injury to a minor in an open pool, as is the case here, that has

moved beyond the forseeability of risk factor. Accordingly, there is no genuine issue of material fact as to the magnitude of guarding against the injury and the consequences of placing the burden on the Defendants.

### 2. Distracting Influences

Plaintiff next contends that a genuine issue of fact exists as to whether or not there was a distracting influence in or around the pool so as to render the obvious danger rule inapplicable to this case. Pl. Resp. at 8. Relying on *Ward*, Plaintiff argues that Jacob could have been distracted by one of the items in the pool, or could have unintentionally fallen into the pool. *Id*. *Ward* recognized that "even though some conditions may be 'known' or 'obvious,' a defendant's duty may extend to such situations where the defendant can anticipate that a plaintiff may, whether from distraction or forgetfulness, fail to avoid the risk posed." *Stevens*, 580 N.E.2d at 167 (citing *Ward*, 554 N.E.2d at 234).

The *Englund* and *Stevens* courts addressed and refuted arguments concerning distractions around open and obvious dangers. In both cases, the plaintiffs argued that *Ward*'s distraction exception should apply to hold landowners liable for injuries resulting from obvious dangers. *Englund*, 615 N.E.2d at 867; *Stevens*, 580 N.E.2d at 167. In *Ward*, a customer walked into a concrete post outside the exit door of a K Mart store; the customer had seen the post before entering the store, but when he left the store his view of the post had been blocked by a large mirror that he had bought and carried out. *Ward*, 554 N.E.2d at 224-25. The *Ward* court held that the store's duty of reasonable care encompassed the risk that one of its customers would collide with the post while carrying a large, bulky item out of the store. 554 N.E.2d at 234. Both courts rejected the plaintiffs' arguments, instead observing that *Ward* had noted that a defendant need not anticipate the negligence of others and that the relevant inquiry is "whether the defendant should reasonably

anticipate injury to those entrants on his premises who are generally exercising reasonable care for their own safety, but who may reasonably be expected to be distracted . . . or forgetful of the [obvious] condition after having momentarily encountered it." *Englund*, 615 N.E.2d at 867; *Stevens*, 580 N.E.2d at 167.

Looking at the duty of parental supervision in connection with the exception for open and obvious dangers, both courts focused on the distraction of the *parents*, rather than focusing on the *child* exercising reasonable care for her own safety. *See Englund*, 615 N.E.2d at 867-68; *Stevens*, 580 N.E.2d at 167. The *Englund* court rejected the *Ward* argument, reasoning that the customer injured in *Ward* had seen the obvious post only momentarily upon entering the store and was not cognizant of it when he left the store; where in contrast, the pool dominated the homeowner's backyard and was a blatantly obvious risk to the child's parent, if not to the child. *Englund*, 615 N.E.2d at 867-68. The *Stevens* court reasoned that it could not be foreseen that the parents would forget about the existence and location of the water, nor could it be foreseen that they would be "reasonably" distracted. 580 N.E.2d at 167. Relying on *Englund* and *Stevens*, the facts of this case do not show that any possible distractions would obviate the application of the obvious danger rule. Jacob was under the supervision of Lamb when he was at the Defendants' home; Lamb knew about the existence of the backyard pool from being at Defendants' house many times before; and it was unforeseeable that Lamb would forget about the pool and be distracted in making sure that Jacob would not enter it.

Plaintiff further cites to *T.T. by B.T. v. Kim*, 662 N.E.2d 561 (Ill. App. Ct. 1996) for the proposition that compares a puddle to Defendants' pool. Pl. Resp. at 8. However, *T.T. by B.T.* is distinguishable in that the court there found that the risks created by the *tarp* covering the swimming pool were of a type which children would not be expected to recognize. 662 N.E.2d at 565-66. It

was the tarp, and not the pool itself, that was the unappreciable danger. *Id*. There is no allegation that the pool into which Jacob fell was covered, partially or completely, by a tarp or cover that would have added a risk of danger. Additionally, although the element of attraction impacts the determination of a duty, it is untenable to compare the attraction of a puddle to the attraction of Defendants' pool. While it is likely that a child playing in a six-inch-deep puddle on a tarp covering a pool may not realize that he may fall into the pool, it is certainly not likely that a child would go to the edge of an uncovered twenty-seven feet diameter pool and not realize that he could enter the water. Lastly, Plaintiff fails to mention the presence of toys in the pool as a material fact in her Local Rule 56.1 statement of material facts. Because Plaintiff cannot show that the *Ward* exception correctly applies, Plaintiff has not shown that there is a genuine issue of material fact existing as to whether there was any distracting influence as to render the obvious danger rule inapplicable.

### 3. Mrs. Dinkins' Duty to Supervise Jacob

Finally, Plaintiff's argues that there is a genuine issue of material fact as to whether Mrs. Dinkins assumed responsibility for Jacob when he came into the house. Pl. Resp. at 12. The fact that Mrs. Dinkins talked to Jacob alone for approximately two to three minutes is not sufficient to create a duty to prevent Jacob from entering the pool. In *Stevens*, the plaintiff asserted that members of the homeowners' household were present in the house with the child before she disappeared, while the homeowners disputed this claim. 580 N.E.2d at 162. The *Stevens* court affirmed summary judgment in favor of the defendants in spite of the fact that other persons were in the house because the child was on the homeowners' premises in the presence of her parent. *Id*. In *Englund*, the court found that "even if the homeowners acknowledged that they were lax in their attention to [the child], this does not relieve plaintiff of her duty to [the child] and does not render the homeowners liable for [the child's] death." 615 N.E.2d at 868. *Englund* went further to suggest that even if a

homeowner is careless in his supervision of a child, as long as a parent is present, the parent has the primary duty to supervise. Plaintiff has not cited any caselaw where the homeowners assumed or owed a duty to supervise a child from an obvious danger while the child's parent was present. Therefore, this Court finds on the basis of the reasoning in *Stevens* and *Englund* that Lamb's presence at the Dinkins' home precluded Mrs. Dinkins from assuming any responsibility for Jacob and that there is no genuine issue of material fact as to whether Lamb's presence bars any recovery of Plaintiff.

## II. Violation of the Will County Regulations as Evidence of Negligence

Although Plaintiff makes the majority of her argument concerning the Regulations with respect to common law negligence under the *Kahn* test, Plaintiff hints in her response to the Motion for Summary Judgment that a violation of safety regulations, standing alone, can be evidence of negligence by a landowner. Pl. Resp. at 11. Because the Court finds that Jacob was not in the class of persons that the Regulations were designed to protect, there is no genuine issue of material fact as to the impact of any violation of the Regulations upon Defendants' liability.

A violation of a statute or ordinance designed to protect human life is prima facie evidence of negligence. *Kalata v. Anheuser-Busch Cos.*, 581 N.E.2d 656, 661 (Ill. 1991). Violations of administrative rules, regulations, and orders designed to protect human life or property are also considered prima facie evidence of negligence, provided they are validly adopted and have the force of the law. *Davis v. Marathon Oil Co.*, 356 N.E.2d 93, 97 (Ill. 1976). Statutes and ordinances designed to protect human life establish the standard of conduct required of a reasonable person and thus "fix the measure of legal duty." *Noyola v. Bd. of Educ. of Chi.*, 688 N.E.2d 81, 84-85 (Ill. 1997). A plaintiff is not required to show defendants' awareness of the statutory violation since the violation itself is prima facie evidence of negligence. *Price by Massey v. Hickory Point Bank &*

*Trust, Trust No. 0192*, 841 N.E.2d 1084, 1089 (Ill. App. Ct. 2006).

To establish a duty based on a statute or an ordinance designed to protect human life, the plaintiff must first show that: (1) the plaintiff is a member of the class of persons the statute or ordinance was designed to protect; and (2) the injury is the type of injury that the ordinance was intended to protect against. *Kalata*, 581 N.E.2d at 661. Whether these conditions have been satisfied is a question of law for the court. *Batteast v. Wyeth Labs., Inc.*, 560 N.E.2d 315, 323 (Ill. 1990). Because evidence of a violation of a statute is prima facie evidence of negligence, and not negligence *per se*, a defendant can prevail despite an ordinance violation by showing that he acted reasonably under the circumstances. *Kalata*, 581 N.E.2d at 661.

Courts applying Illinois law have been conflicted on whether an open and obvious danger, which in and of itself would not create a duty, negates the duty that could arise from a defendant's violation of a statute or ordinance. *Compare Hoesly v. Chi. Cent. & Pac. R.R.*, 153 F.3d 478 (7th Cir. 1998) (cause of action based on a violation of regulations is susceptible to the limits of Illinois common law tort liability, including the rule of open and obvious dangers) *with Bier v. Leanna Lakeside Prop. Ass'n,* 711 N.E.2d 773 (Ill. App. Ct. 1999) (open and obvious nature of a condition goes to the issue of proximate cause, but does not negate a duty imposed by a statute)*.* In interpreting this conflict, the Seventh Circuit has held that since landowners owe no duty to protect people from open and obvious dangers, possible violations of regulations do not then impose a duty. *Hoesly*, 153 F.3d at 480-81. In *Hoesly*, the plaintiff was injured when he tripped on gravel near the defendant's railroad tracks and fell onto the tracks. 153 F.3d at 479. The plaintiff alleged negligence based on a violation of Illinois Commerce Commission regulations, specifically regulations concerning railroad crossings. *Id.* The Seventh Circuit reasoned that the defendant owed no duty to the plaintiff because "the open and obvious nature of the condition itself gives

18

caution and therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks." *Id*. at 481 (quoting *Bucheleres v. Chi. Park Dist.*, 665 N.E.2d 826, 832 (Ill. 1996)).

The Illinois Supreme Court has also held that the relevancy of a statutory violation extends only to the issue of whether the landowner had acted with less than reasonable care, and that it would not have the effect of creating a duty where none existed. *Feldscher v. E & B, Inc.*, 447 N.E.2d 1331, 1336 (Ill. 1983). Illinois appellate courts have followed this holding. *Miller v. Archer-Daniels-Midland Co.*, 634 N.E.2d 1108, 1113 (Ill. App. Ct. 1994) (violations of Occupational Safety and Health Administration standards may constitute evidence of negligence, but do not create a statutory duty to protect plaintiff from an open and obvious hole); *see also Hinojosa v. City of Chi. Heights,* 519 N.E.2d 976, (Ill. App. Ct. 1988) (when no special right of action is provided, an ordinance violation is relevant only as evidence on the issue of due care and an ordinance cannot enlarge the duties owed beyond those existing at common law).

However, Illinois courts have also imposed a statutory duty in some instances where no duty existed at common law. *See O'Neil v. Krupp*, 589 N.E.2d 185, 189-90 (Ill. App. Ct. 1992) (listing Illinois Supreme Court decisions involving duties that were created by statute or ordinance). The Second District Illinois Appellate Court has held that in the case of a statutory violation, the open and obvious nature of a condition would go to the issue of proximate cause to be resolved by a jury, but would not negate a duty being imposed under the statute. *Bier*, 711 N.E.2d at 783-84. In *Bier*, the plaintiff was injured while using a rope swing when he fell into the lake, hitting his head on the lake bottom. 771 N.E.2d at 775. The court held that although the rope swing was an obvious condition for which the defendant owed the plaintiff no *common-law* duty, the defendant's possible violation of a safety statute was still prima facie evidence of negligence and should be submitted to

a jury to determine proximate cause and whether the defendant acted reasonably under the circumstances. *Id.* at 780, 785. The *Bier* court construed *Feldscher* as only stating, in dicta, that the violation of a statute does not amount to negligence *per se*. *Id.* at 784. The *Bier* court also distinguished the Seventh Circuit's holding in *Hoesly* and reasoned that the statute in *Hoesly* had simply adopted the common-law duty standard of reasonable care without addressing the issue of the violation of a regulatory scheme that placed specific duties upon the defendant to do or not to do specific acts. *Id.* at 785; *see Hoesly*, 153 F.3d at 480. The *Bier* court concluded that the open and obvious doctrine is not a common-law defense, but rather a consideration in the duty analysis. 711 N.E.2d at 785.

Despite the conflicting caselaw, this Court must first decide whether the Regulations alleged to be violated were designed to protect human life. After this determination, this Court must decide whether (1) Jacob was a member of the class of persons the Regulations were designed to protect; and whether (2) Jacob's drowning was the type of injury that the Regulations were intended to protect against. There is no dispute that the Regulations were designed to protect human life. The Will County Zoning Ordinance was adopted for, among other things, the promotion of the public health, safety, morals, comfort, and welfare of the present and future inhabitants of Will County. Pl. Resp. at Ex. 1, Ex. 2. Similarly, the Will County Building Code sets forth requirements that are considered to be the minimum to safeguard life or limb, health, and public welfare. Pl. Resp. at Ex. 3. The Will County Swimming Regulations serve the same purpose as the Zoning Ordinance since they are in accordance with the regulations of the Zoning Ordinance. Pl. Resp. at Ex. 4. The Will County Swimming Pool Regulations also state that "[t]hese regulations are intended to help prevent drowning and electrical shocks." *Id.*

However, although Plaintiff has also shown that the Regulations were intended to protect

against drowning, the injury Jacob suffered, Jacob was not in the class of persons the Regulations were designed to protect. The Will County Swimming Pool Regulations state:

> All owners of private swimming pools shall enclose said pool or the entire lot where said pool is located, during and after construction, with a wall or fence of a minimum height of five (5) feet *in such a manner as to prevent uncontrolled access by children from public areas or from adjacent lots.*

*Id.* (emphasis added). As the plain language reveals, the fencing requirements were intended to prevent uninvited, trespassing children from entering landowners' pools. Jacob was neither uninvited nor trespassing; rather he was an invited guest. The fencing requirements were not meant to prevent access to pools by the landowners' invited guests. Although the section in the Will County Swimming Pool Regulations regarding self-closing and self-latching gates does not specifically refer to a class of persons, it can only be assumed that it refers to the same class of persons as the fencing requirements, i.e., children from public areas or from adjacent lots. As a matter of law, Plaintiff has not shown that the Regulations were designed to protect an invited guest, such as Jacob, and therefore, Plaintiff cannot establish a negligence claim based on a statutory or regulatory violation.

## III. Proximate Cause

Even assuming that Plaintiff was able to establish either a common law duty and breach or a duty and breach based on a regulatory violation, Plaintiff cannot show that Defendants' actions or violations of the Regulations were the proximate cause of Jacob's death. If a duty is imposed because of a statutory or regulatory violation, the plaintiff must show that the violation itself was the proximate cause of the injury. *Kalata*, 581 N.E.2d at 661. To find proximate cause, a court must find that plaintiff's injuries are the natural and probable result of the defendant's acts or omissions and that an ordinarily prudent person could have foreseen plaintiff's injuries as likely to occur as

a result of defendant's conduct. *Kohn v. Laidlaw Transit, Inc.*, 808 N.E.2d 564, 572 (Ill. App. Ct. 2004). However, if the acts of a defendant do nothing more than furnish a condition by which an injury is made possible by reason of some subsequent, independent act, the creation of the condition is not a proximate cause of the injury. *Stojkovich v. Monadnock Bldg.*, 666 N.E.2d 704, 708 (Ill. App. Ct. 1996). Proximate cause is ordinarily a question for the jury, but it may be decided as a matter of law when there can be no reasonable difference in the inferences to be drawn by reasonable men from the undisputed facts. *Englund v. Englund*, 615 N.E.2d 861, 868 (Ill. App. Ct. 1993).

Two extremely similar and previously discussed cases, *Englund* and *O'Clair*, are on point on the issue of proximate cause. In *Englund*, the plaintiff alleged that the homeowners negligently constructed a defective pool deck. 615 N.E.2d at 864. The plaintiff alleged that the deck had permanent stairs rather than stairs that would swing up and lock out of the way; that a deck plank would depress when stood upon; and that the deck had no self-closing and self-locking gate. *Id.* The plaintiff further alleged that the homeowners negligently allowed pool toys to clutter the surface of the water after the children had left the pool. *Id.* Although the court in *Englund* ultimately decided that the homeowners were not liable because no duty was owed in the first place, the court also concluded that "while the homeowners could have done many things which would have prevented [the] tragedy, the evidence shows that the proximate cause of [the child] death was her mother's and father's failure to make sure that [the child] did not get into the water." *Id.* at 868. The court further concluded that the defective condition of the pool deck, which allowed the child to gain access to the water, merely made her death possible; it was not the proximate cause of the drowning. *Id.*

In *O'Clair*, the plaintiff alleged that the homeowners failed to lock the sliding door in the

family room, which led to the pool; failed to properly drain the pool; failed to cover the pool; failed to fence the pool; failed to replace the pool ladder; and failed to remove toys from the pool. 735 F. Supp. at 1346-47. The court decided the case based on a lack of duty; however, the court also addressed the plaintiff's allegations regarding the condition of the pool. *Id.* at 1351. The court concluded that the conditions merely made the drowning possible; the drowning was not due to the condition of the pool, but the objectively unforeseeable failure of the plaintiff to lock the sliding door leading to the pool or to take other protective measures. *Id.* at 1352.

The tragic events and circumstances before this Court are eerily similar to those that were before the *Englund* court. As in *Englund*, the Defendants' deck gates were not self-closing or self-latching. Pl. 56.1 at ¶¶ 19-21. In *Englund*, the plaintiff brought the child to the homeowners' house and was at the house the entire time up until the drowning; similarly, Lamb was on the Defendants' property the entire time after he and Jacob arrived until Jacob's drowning. Def. 56.1 at ¶ 35. The court in *Englund* faced a factual dispute as to whether a small child could open the latch from outside the deck and an admission by the defendant that he should have locked the gate. *Englund*, 615 N.E.2d at 863, 868. The only disputed facts in this case involve the locks, or lack thereof, on Defendants' pool deck gates. Defendants' LR 56.1 (b)(3)(B) Response to Plaintiff's Statement of Material Facts at ¶¶ 16, 18. Implicit in that dispute is whether Jacob could open the gates on his own, or could only access the pool if Defendants' had left the gates open.

If Defendants' lack of fencing or the condition of the Defendants' pool deck was relevant to an inquiry into the proximate cause of Jacob's drowning, whether the gates had locks on them or whether Jacob could unlock the gates himself or whether Mr. Dinkins had left the gates open would have to be decided by a jury. However, *Englund* and *O'Clair* persuasively reason that these issues are not relevant to proximate cause. Although *Englund* and *O'Clair* both found in favor of the

homeowners because of a lack of duty to the injured child, the courts clearly expressed that even had the homeowners breached a duty to the injured child, it was the parents' lack of supervision that was the proximate cause of the accidents, not the alleged defects in the pools or decks at issue. *Englund*, 615 N.E.2d at 868; *O'Clair*, 735 F. Supp. at 1352. Any violation of the Regulations that Defendants' may have committed by not building a fence around their pool or by not installing self-closing or self-latching gates were only conditions that made Jacob's drowning possible; they were not the proximate cause of the accident. While it is true that the alleged pool defects in *Englund* and *O'Clair* were not alleged to be violations of a safety regulation, as the Plaintiff here alleges, the issue of proximate cause does not turn on this distinction. If the acts of a defendant do nothing more than furnish a condition by which an injury is made possible by reason of some subsequent, independent act, the creation of the condition is not a proximate cause of the injury. *Stojkovich*, 666 N.E.2d at 708. Whether Defendants' pool and deck were in violation of the Regulations is of no consequence; *Englund* and *O'Clair* support the conclusion that Lamb's failure to supervise Jacob was a subsequent, independent act that broke any chain of causation between the alleged violations and the drowning.

Because the Regulations were designed to prevent uninvited and trespassing children from accessing homeowners' pools, Defendants' alleged violations of the Regulations are not prima facie evidence of negligence based on a statutory or regulatory violation. Jacob was an invited guest, not a trespasser; therefore, he was not in the class of persons the Regulations were designed to protect. Even assuming that Defendants' alleged violations of the Regulations created a duty to Jacob and Defendants breached that duty, the violations were not the proximate cause of Jacob's drowning. Defendants' violations were only conditions that made Jacob's drowning possible; this drowning was proximately caused by his father's failure to make sure he did not enter the pool unsupervised.

24

Because Plaintiff has not shown that a genuine issue of material fact exists regarding these conclusions, Defendants cannot be held liable based on a statutory violation negligence theory. This finding further supports this Court's grant of summary judgment for Defendants.

## CONCLUSION AND ORDER

Reviewing all evidence in the record and drawing all reasonable inferences in favor of Plaintiff, there is no genuine issue as to any material fact that Defendants owed a duty to Jacob, breached that duty, and proximately caused his drowning death. In this case, Defendants' pool was an obvious danger, and even assuming the pool was made dangerous by the alleged regulatory violations, Lamb knew of the lack of fencing around the pool and the condition of the deck from his previous visits. Because Plaintiff has not shown genuine issues of material fact as to the forseeability of Lamb's failure to supervise Jacob and the obvious danger of Defendants' swimming pool, Plaintiff has not established that Defendants owed a common law duty of care to Jacob as a matter of law. This conclusion supports this Court's grant of summary judgment for Defendants. Additionally, even assuming Defendants' alleged violations of the Regulations warranted a finding of a duty and breach, Plaintiff has not shown that Defendants acts or violations proximately caused Jacob's death. Lamb's failure to supervise Jacob was unforeseeable, the swimming pool presented an obvious danger that made the risk of harm unforeseeable, Jacob was not intended to be protected under the Regulations, and the alleged violations of the Regulations were not the proximate cause of Jacob's death.

THEREFORE, Defendants' Motion for Summary Judgment on all counts is granted and judgment is entered in favor of Defendants.

So ordered.

_____
Virginia M. Kendall, United States District Judge
Northern District of Illinois

Date: July 20, 2006